Daniel Sadeh, Esq.
**HALPER SADEH LLP**
667 Madison Avenue, 5th Floor
New York, NY 10065
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NICOLAS DUENAS, | Case No: |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| SQUARE, INC., JACK DORSEY, ROELOF BOTHA, AMY BROOKS, SHAWN CARTER, PAUL DEIGHTON, RANDY GARUTTI, JIM MCKELVEY, MARY MEEKER, ANNA PATTERSON, LARRY SUMMERS, DAVID VINIAR, and DARREN WALKER, | |
| Defendants. | |

Plaintiff Nicolas Duenas ("Plaintiff"), by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys.

## NATURE OF THE ACTION

1.      This is an action against Square, Inc. ("Square" or the "Company") and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a) and

78t(a), and Rule 14a-9 promulgated thereunder by the SEC, 17 C.F.R. § 240.14a-9, in connection with the proposed merger by which Square will acquire Afterpay Limited ("Afterpay") for 0.375 shares of Square Class A common stock for each Afterpay ordinary share (the "Proposed Transaction"). Square may elect to pay 1% of total consideration in cash.

2.      On October 5, 2021, Defendants caused to be filed with the SEC a Definitive Proxy Statement (the "Proxy Statement") under Section 14(a) of the Exchange Act in connection with the Proposed Transaction.

3.      The Proxy Statement, which recommends that Square shareholders vote in favor of, among other things, the issuance of Square Class A common stock in connection with the Proposed Transaction (the "Stock Issuance"), omits and/or misrepresents material information concerning: (1) Square's and Afterpay's financial projections; (2) the financial analyses performed by Square's financial advisor, Morgan Stanley & Co. LLC ("Morgan Stanley"), in connection with its fairness opinion; (3) potential conflicts of interest involving Morgan Stanley; and (4) the sales process leading up to the Proposed Transaction.

4.      These material misrepresentations and omissions prevent the Company's shareholders from making a fully informed voting decision on the Stock Issuance proposal. Accordingly, the Company's shareholders will be irreparably harmed if these material misrepresentations and omissions are not remedied before the anticipated November 3, 2021 shareholder vote on the Stock Issuance.

## JURISDICTION AND VENUE

5.      The claims asserted herein arise under and pursuant to Sections 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and 78t(a)) and Rule 14a-9 promulgated thereunder by the SEC (17 C.F.R. § 240.14a-9).

6.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as a substantial portion of the transactions and wrongs complained of herein had an effect in this District, the alleged misstatements entered and the subsequent damages occurred in this District, and the Company conducts business in this District.

8.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES**

9.      Plaintiff is, and has been at all relevant times hereto, an owner of Square common stock.

10.      Defendant Square creates tools that enables sellers to accept card payments and provides reporting and analytics, and next-day settlement. The Company's common stock trades on the New York Stock Exchange under the ticker symbol, "SQ."

11.      Defendant Jack Dorsey ("Dorsey") is the Chief Executive Officer (the "CEO"), Co-founder, and Chairman of the Board of the Company.

12.      Defendant Roelof Botha ("Botha") is a director of the Company.

13.      Defendant Amy Brooks ("Brooks") is a director of the Company.

14.      Defendant Shawn "Jay-Z" Carter ("Carter") is a director of the Company.

15.      Defendant Paul Deighton ("Deighton") is a director of the Company.

16.      Defendant Randy Garutti ("Garutti") is a director of the Company.

17.     Defendant Jim McKelvey ("McKelvey") is a Co-founder and director of the Company.

18.     Defendant Mary Meeker ("Meeker") is a director of the Company.

19.     Defendant Anna Patterson ("Patterson") is a director of the Company.

20.     Defendant Larry Summers ("Summers") is a director of the Company.

21.     Defendant David Viniar ("Viniar") is a director of the Company.

22.     Defendant Darren Walker ("Walker") is a director of the Company.

23.     Defendants Dorsey, Botha, Brooks, Carter, Deighton, Garutti, McKelvey, Meeker, Patterson, Summers, Viniar, and Walker are collectively referred to herein as the "Individual Defendants."

24.     Defendants Square and the Individual Defendants are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A.  Background of the Company and the Proposed Transaction

25.     Square was founded in 2009 to enable businesses to accept card payments, an important capability that was previously inaccessible to many businesses. Square has since expanded to provide other products and services to allow businesses to grow. Square's point-of-sale software and other business services help businesses manage inventory, locations, and employees; access financing; engage buyers; build a website or online store; and grow sales. Similarly, Square has built a parallel ecosystem of financial services to help individuals manage their money with Cash App, allowing individuals to store, send, receive, spend and invest their money.

26.     Square has experienced significant growth over the years. For the second quarter

of 2021, Square reported $1.14 billion in gross profit, up 91% year-over-year. Cash App generated $546 million in gross profit, up 94% year-over-year. Square's seller ecosystem generated $585 million in gross profit, up 85% year-over-year.

27.    On August 1, 2021, Square and Afterpay announced the Proposed Transaction whereby Afterpay shareholders would receive a fixed exchange ratio of 0.375 shares of Square Class A common stock for each Afterpay ordinary share held on the record date.  The press release states, in pertinent part:

### Square, Inc. Announces Plans to Acquire Afterpay, Strengthening and Enabling Further Integration Between its Seller and Cash App Ecosystems

*Brings together two of the fastest growing global fintech companies to advance shared mission of economic empowerment and financial inclusion*

August 01, 2021 05:48 PM Eastern Daylight Time

SAN FRANCISCO & MELBOURNE, Australia--(BUSINESS WIRE)--Square, Inc. (NYSE: SQ) and Afterpay Limited (ASX: APT) today announced that they have entered into a Scheme Implementation Deed under which Square has agreed to acquire all of the issued shares in Afterpay by way of a recommended court-approved Scheme of Arrangement. The transaction has an implied value of approximately US$29 billion (A$39 billion) based on the closing price of Square common stock on July 30, 2021, and is expected to be paid in all stock. The acquisition aims to enable the companies to better deliver compelling financial products and services that expand access to more consumers and drive incremental revenue for merchants of all sizes. The closing of the transaction is expected in the first quarter of calendar year 2022, subject to the satisfaction of certain closing conditions outlined below.

"Square and Afterpay have a shared purpose. We built our business to make the financial system more fair, accessible, and inclusive, and Afterpay has built a trusted brand aligned with those principles," said Jack Dorsey, Co-Founder and CEO of Square. "Together, we can better connect our Cash App and Seller ecosystems to deliver even more compelling products and services for merchants and consumers, putting the power back in their hands."

Afterpay, the pioneering global 'buy now, pay later' (BNPL) platform, will accelerate Square's strategic priorities for its Seller and Cash App ecosystems. Square plans to integrate Afterpay into its existing Seller and Cash App business units, enable even the smallest of merchants to offer BNPL at checkout, give

Afterpay consumers the ability to manage their installment payments directly in Cash App, and give Cash App customers the ability to discover merchants and BNPL offers directly within the app.

"Buy now, pay later has been a powerful growth tool for sellers globally," said Alyssa Henry, Lead of Square's Seller business. "We are thrilled to not only add this product to our Seller ecosystem, but to do it with a trusted and innovative team."

"The addition of Afterpay to Cash App will strengthen our growing networks of consumers around the world, while supporting consumers with flexible, responsible payment options," said Brian Grassadonia, Lead of Square's Cash App business. "Afterpay will help deepen and reinforce the connections between our Cash App and Seller ecosystems, and accelerate our ability to offer a rich suite of commerce capabilities to Cash App customers."

Afterpay is an industry leader with a best-in-class product and strong cultural alignment with Square. As of June 30, 2021, Afterpay serves more than 16 million consumers and nearly 100,000 merchants globally, including major retailers across key verticals such as fashion, homewares, beauty, sporting goods and more. Afterpay empowers consumers to access the things they want and need, while allowing them to maintain financial wellness and control. Afterpay also assists merchants in growing their businesses by helping to drive repeat purchases, increase average transaction sizes, and provide their buyers with the ability to pay over time. Afterpay is deeply committed to helping people spend responsibly without incurring service fees for those who pay on time, interest, or revolving debt, and supports consumers in a number of countries across APAC, North America and Europe (including under its Clearpay brand).

"By combining with Square, we will further accelerate our growth in the U.S. and globally, offer access to a new category of in-person merchants, and provide a broader platform of new and valuable capabilities and services to our merchants and consumers. We are fully aligned with Square's purpose and, together, we hope to continue redefining financial wellness and responsible spending for our customers," said Anthony Eisen and Nick Molnar, Afterpay Co-Founders and Co-CEOs. "The transaction marks an important recognition of the Australian technology sector as homegrown innovation continues to be shared more broadly throughout the world. It also provides our shareholders with the opportunity to be a part of future growth of an innovative company aligned with our vision."

For Square, BNPL presents an attractive opportunity supported by shifting consumer preferences away from traditional credit, especially among younger consumers, consistent demand from merchants for new ways to grow their sales, and the global growth in omnichannel commerce. Combined, Square and Afterpay's complementary businesses present an opportunity to drive growth across multiple strategic levers, including:

6

- **Enhance both the Seller and Cash App ecosystems.** Afterpay's global merchant base will accelerate Square's growth with larger sellers and expansion into new geographies, while helping to drive further acquisition of new Square sellers. Afterpay will expand Cash App's growing product offering, enable customers to manage their repayments, and help customers discover new merchants when the Afterpay App is integrated into Cash App.
- **Bring added value, differentiation, and scale to Afterpay.** Afterpay will benefit from Square's large and growing customer base of more than 70 million annual transacting active Cash App customers and millions of sellers, which will expand Afterpay's reach and growth both online and in-person. Afterpay consumers will receive the benefits of Cash App's financial tools, including money transfer, stock and Bitcoin purchases, Cash Boost, and more.
- **Drive long-term growth with meaningful revenue synergy opportunities.** Square believes Afterpay will be accretive to gross profit growth with a modest decrease in Adjusted EBITDA margins expected in the first year after completion of the transaction. Square sees an opportunity to invest behind Afterpay's strong unit economics as well as attractive growth synergies, including the opportunity to introduce offerings and drive incremental growth for sellers and increased engagement for Cash App customers.

Afterpay's Co-Founders and Co-CEOs will join Square upon completion of the transaction and help lead Afterpay's respective merchant and consumer businesses, as part of Square's Seller and Cash App ecosystems. Square will appoint one Afterpay director as a member of the Square Board following closing.

\*       \*       \*

**Transaction Terms**

Under the terms of the Scheme Implementation Deed, which has been approved by the members of the Boards of Directors of both Square and Afterpay, Afterpay shareholders will receive a fixed exchange ratio of 0.375 shares of Square Class A common stock for each Afterpay ordinary share they hold on the record date. Square may elect to pay 1% of total consideration in cash.

Square has agreed to establish a secondary listing on the Australian Securities Exchange (ASX) to allow Afterpay shareholders to trade Square shares via CHESS Depositary Interests (CDIs) on the ASX. Afterpay shareholders will be able to elect whether to receive the scheme consideration in NYSE listed Square Class A common stock or CDIs. The CDIs listed on the ASX are expected to be eligible for S&P index inclusion in Australia.

Based on Square's closing price of US$247.26 on July 30, 2021, this represents an implied transaction price of approximately A$126.21 per Afterpay share, a premium of approximately 30.6% to Afterpay's latest closing price of A$96.66.

This represents an approximate 21.9% premium over the 10-day volume weighted average Afterpay share price, and an approximate 10.5% premium over the 30-day volume weighted average Afterpay share price, each as of July 30, 2021. Following completion of the transaction, Afterpay shareholders are expected to own approximately 18.5% of the combined company on a fully diluted basis.

The transaction is subject to conditions precedent as is customary for transactions of this nature, including, among other things, receipt of required regulatory approvals and the approval of shareholders of both companies.

**Advisors**

Morgan Stanley & Co. LLC is serving as financial advisor to Square and Wachtell, Lipton, Rosen & Katz and King & Wood Mallesons are serving as its legal advisors. Goldman Sachs and Qatalyst Partners are serving as financial advisors to Afterpay, Highbury Partnership is serving as financial advisor to Afterpay's Board and Gilbert + Tobin and Cravath, Swaine & Moore LLP are serving as Afterpay's legal advisors.

**About Square, Inc.**

Square, Inc. (NYSE: SQ) builds tools to empower businesses and individuals to participate in the economy. Sellers use Square to reach buyers online and in person, manage their business, and access financing. Individuals use Cash App to spend, send, store, and invest money. And TIDAL is a global music and entertainment platform that expands Square's purpose of economic empowerment to artists. Square, Inc. has offices in the United States, Canada, Japan, Australia, Ireland, Spain, Norway, and the UK.

**About Afterpay Limited**

Afterpay Limited (ASX: APT) is transforming the way we pay by allowing customers to receive products immediately and pay for their purchases over four installments, always interest-free. The service is completely free for customers who pay on time - helping people spend responsibly without incurring interest, fees or revolving debt. As of June 30, 2021, Afterpay is offered by nearly 100,000 of the world's favourite retailers and has more than 16.2 million customers.

Afterpay is currently available in Australia, United States, Canada, New Zealand, and in the United Kingdom, France, Italy and Spain, where it is known as Clearpay. Afterpay is on a mission to power an economy in which everyone wins.

**B. The Proxy Statement Contains Materially False and Misleading Statements and Omissions**

28.     The Proxy Statement omits and/or misrepresents material information concerning:

(1) Square's and Afterpay's financial projections; (2) the financial analyses performed by Square's financial advisor, Morgan Stanley, in connection with its fairness opinion; (3) potential conflicts of interest involving Morgan Stanley; and (4) the sales process leading up to the Proposed Transaction.

29.    The omission of the material information (referenced below) renders the following sections of the Proxy Statement false and misleading, among others: (i) Summary of Certain Financial Projections Provided to Square's Board of Directors and Square's Financial Adviser; (ii) Square's Reasons for the Transaction; (iii) Recommendation of Square's Board of Directors; (iv) Opinion of Square's Financial Adviser; and (v) Background of the Transaction.

30.    Unless and until the material misstatements and omissions (referenced below) are remedied before the November 3, 2021 shareholder vote on the Stock Issuance, the Company's shareholders will be forced to make a voting decision on the Stock Issuance without full disclosure of all material information. In the event Defendants fail to disclose the following information before the shareholder vote, Plaintiff may seek damages resulting from Defendants' misconduct.

### 1.    Material Omissions Concerning Square's and Afterpay's Financial Projections

31.    The Proxy Statement omits material information concerning Square's and Afterpay's financial projections.

32.    With respect to the "Square Consensus Projections" for the period 2021 through 2040, the Proxy Statement fails to disclose: (1) all line items used to calculate (i) Gross Profit, (ii) Adjusted EBITDA, and (iii) Unlevered Free Cash Flow; (2) Square's net income projections; and (3) a reconciliation of all non-GAAP to GAAP financial metrics.

33.    With respect to the "Afterpay Selected Street Projections" and "Afterpay Standalone Projections" for the period 2021 through 2035, the Proxy Statement fails to disclose:

(1) all line items used to calculate (i) Gross Profit, (ii) Adjusted EBITDA, and (iii) Levered Free Cash Flow; (2) Afterpay's net income projections; and (3) a reconciliation of all non-GAAP to GAAP financial metrics.

34.    The disclosure of the aforementioned projected financial information is material because it would provide Square shareholders with a basis to project the future financial performance of Square and the combined company and would allow shareholders to better understand the financial analyses performed by Square's financial advisor in support of its fairness opinion. Shareholders cannot hope to replicate management's inside view of the future prospects of the Company. Without such information, which is uniquely possessed by Square and its financial advisor, Square shareholders are unable to determine how much weight, if any, to place on the Company's advisor's fairness opinion in determining whether to vote for or against the Stock Issuance.

35.    The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

**2.    Material Omissions Concerning Morgan Stanley's Financial Analyses**

36.    In connection with the Proposed Transaction, the Proxy Statement omits material information concerning Morgan Stanley's financial analyses.

37.    With respect to Morgan Stanley's "*Afterpay Public Trading Comparables Analysis*," the Proxy Statement discloses that Morgan Stanley compared Afterpay to Shopify, Affirm, and Square, but fails to disclose the individual multiples and financial metrics of each company observed by Morgan Stanley in its analyses.

38.    With respect to Morgan Stanley's "*Square Public Trading Comparables Analysis*," the Proxy Statement discloses that Morgan Stanley compared Square to Shopify, Affirm, and Afterpay, but fails to disclose the individual multiples and financial metrics of each company

observed by Morgan Stanley in its analyses.

39.     With respect to Morgan Stanley's "*Afterpay Discounted Cash Flow Analysis*," the Proxy Statement fails to disclose: (1) all line items underlying the levered free cash flows; (2) the individual inputs and assumptions underlying the: (i) perpetual growth rates of 3.5% to 4.5%, and (ii) discount rates ranging from 8% to 10%; (3) the terminal values; and (4) the number of fully diluted shares of Afterpay.

40.     With respect to Morgan Stanley's "*Square Discounted Cash Flow Analysis*," the Proxy Statement fails to disclose: (1) all line items underlying the free cash flows; (2) the individual inputs and assumptions underlying the: (i) perpetual growth rates of 3.5% to 4.5%, and (ii) discount rates ranging from 10% to 12%; (3) the terminal values; (4) the net debt and non-controlling interest used in the analysis; and (5) the number of fully diluted shares of Square.

41.     With respect to Morgan Stanley's "*Equity Research Analysts' Future Price Targets*" for Afterpay and Square, Morgan Stanley calculated a wide range implied exchange ratio of 0.071x to 0.749x. The Proxy Statement, however, fails to disclose: (1) the individual price targets observed by Morgan Stanley in its analysis; and (2) the sources thereof.

42.     With respect to Morgan Stanley's "*Precedent Transactions Premia*" analysis, the Proxy Statement fails to identify each of the transactions observed in the analysis and disclose the premiums for each transaction observed.

43.     The valuation methods, underlying assumptions, and key inputs used by Morgan Stanley in rendering its purported fairness opinion must be fairly disclosed to Square shareholders. The description of Morgan Stanley's fairness opinion and analyses, however, fails to include key inputs and assumptions underlying those analyses. Without the information described above, Square shareholders are unable to fully understand Morgan Stanley's fairness

opinion and analyses, and are thus unable to determine how much weight, if any, to place on them in determining whether to vote for or against the Stock Issuance. This omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

### 3. Material Omissions Concerning Potential Conflicts of Interest Involving Morgan Stanley

44.    The Proxy Statement omits material information concerning potential conflicts of interest involving Morgan Stanley.

45.    The Proxy Statement discloses that Morgan Stanley: (1) has provided Square with financial advisory services and a fairness opinion in connection with the Proposed Transaction; (2) shall receive a $30 million fee and an additional discretionary fee of up to $15 million for providing such services; (3) earned approximately $5 to $10 million from Square for providing financing services within the past two years of the date of its fairness opinion; (4) is a lender to Square; and (5) has not received any fees from Afterpay for providing financial advisory or financing services within the past two years of the date of its fairness opinion, stating in relevant part:

> Under the terms of its engagement letter, ***Morgan Stanley provided Square with financial advisory services and a financial opinion in connection with the Transaction***, described in this section and attached to this proxy statement as Annex C. ***Square has agreed to pay Morgan Stanley for its services a fee of approximately $30 million, $25 million of which will be paid upon the closing of the Transaction, and $5 million of which was paid upon the public announcement of the Transaction and an additional discretionary fee of up to $15 million***, which amount, if any, will be determined in the sole discretion of Square and paid upon the closing of the Transaction. Square has also agreed to reimburse Morgan Stanley for its reasonable expenses, including reasonable fees of outside counsel and other professional advisers incurred in connection with its engagement. In addition, Square has agreed to indemnify Morgan Stanley and its affiliates, their respective directors, officers, agents and employees and each other person, if any, controlling Morgan Stanley or any of its affiliates against certain liabilities and expenses relating to or arising out of Morgan Stanley's engagement,

12

including certain liabilities under the federal securities laws. In the two years prior to the date of its opinion, ***Morgan Stanley and its affiliates have provided financing services to Square and received aggregate fees of approximately $5 million to $10 million from Square in connection with such services***. ***In the two years prior to the date of its opinion, Morgan Stanley and its affiliates have not received any fees from Afterpay for financial advisory or financing services***. ***In addition, as of the date of its opinion, Morgan Stanley or an affiliate thereof is a lender to Square***.

46.     The Proxy Statement also discloses that Morgan Stanley beneficially owns and has dispositive and shared voting power over millions of shares of Square Class A common stock, stating in relevant part:

> Based solely on a Schedule 13G/A, reporting beneficial ownership as of December 31, 2020, filed with the SEC on February 12, 2021, ***Morgan Stanley shared dispositive power over 24,316,533 shares of Square Class A common stock and shared voting power over 18,958,700 shares of Square Class A common stock, which represented approximately 6.3% of the total Square Class A common stock outstanding.***

Proxy Statement at 82 (emphasis added).

47.     In light of these revelations, and others, the Proxy Statement fails to disclose, and must disclose, the timing and nature of past financial advisory services Morgan Stanley and its affiliates provided Square and its affiliates (aside from those provided in connection with the Proposed Transaction), including the amount of compensation Morgan Stanley received or expects to receive for providing such services within the past two years of the date of its fairness opinion.

48.     The disclosure of Morgan Stanley's compensation and potential conflicts of interest to shareholders is required due to its central role in the evaluation, exploration, selection, and/or implementation of strategic alternatives and the rendering of any fairness opinion, as well as its significant and ongoing business relationship with and beneficial ownership interest in Square. Disclosure of Morgan Stanley's additional potential conflicts of interest may inform shareholders on how much weight to place on Morgan Stanley's analyses.

49.     The omission of the above-referenced information renders the Proxy Statement materially incomplete and misleading. This information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

**4.   Material Omissions Concerning the Sales Process Leading up to the Proposed Transaction**

50.     The Proxy Statement omits material information concerning the sales process leading up to the Proposed Transaction.

51.     The Proxy Statement sets forth the following concerning Defendant Summers's recusal from the Board's discussions concerning the Proposed Transaction:

> In light of his service on Afterpay's U.S. Advisory Board and his equity interest in Afterpay (as further described in the section "—*Interests of Square Executive Officers and Directors in the Transaction*"), Dr. Lawrence Summers, who had recused himself from portions of prior deliberations of Square's board of directors regarding the Transaction, did not attend the meeting or vote on the Transaction.

> Proxy Statement at 66.

52.     The Proxy Statement, however, fails to disclose the specific details of each time Defendant Summers recused himself from the Board's deliberations concerning the Proposed Transaction.

53.     Further, the press release announcing the Proposed Transaction provides that Afterpay's co-founders and co-CEOs will join Square upon completion of the Proposed Transaction, stating in pertinent part:

> Afterpay's Co-Founders and Co-CEOs will join Square upon completion of the transaction and help lead Afterpay's respective merchant and consumer businesses, as part of Square's Seller and Cash App ecosystems. Square will appoint one Afterpay director as a member of the Square Board following closing.

54.     The Proxy Statement, however, fails to sufficiently disclose the details of all employment-related discussions and negotiations that occurred between Square's and Afterpay's executive officers and directors, including the parties to such communications, when they

occurred, and the content discussed/communicated.

55.     Any communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to shareholders. This information is necessary for shareholders to understand potential conflicts of interest of management and the Board. Such information may illuminate the motivations that would prevent fiduciaries from acting solely in the best interests of the Company's shareholders.

56.     The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

**COUNT I**

**For Violations of Section 14(a) and Rule 14a-9 Promulgated Thereunder**
**Against All Defendants**

57.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

58.     During the relevant period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC.

59.     Each of the Individual Defendants, by virtue of his/her positions within the Company as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a) of the Exchange Act. Defendants, by use of the mails and means and instrumentalities of interstate commerce, solicited and/or permitted the use of their names to file and disseminate the Proxy Statement with respect to the Proposed Transaction and/or Stock Issuance. The Defendants were, at minimum, negligent in filing the materially false and misleading Proxy Statement.

60.    The false and misleading statements and omissions in the Proxy Statement are material in that a reasonable shareholder would consider them important in deciding how to vote on the Stock Issuance.

61.    By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

62.    Because of the false and misleading statements and omissions in the Proxy Statement, Plaintiff is threatened with irreparable harm.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

63.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

64.    The Individual Defendants acted as control persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their senior positions as officers and/or directors of the Company and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the false and misleading Proxy Statement.

65.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information

with respect to the Proxy Statement, and to correct promptly any public statements issued by the Company which were or had become materially false or misleading.

66.     In particular, each of the Individual Defendants had direct and supervisory involvement in the operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Individual Defendants were provided with or had unlimited access to copies of the Proxy Statement and had the ability to prevent the issuance of the statements or to cause the statements to be corrected. The Proxy Statement at issue contains the recommendation of the Individual Defendants to approve the Proposed Transaction and/or Stock Issuance. Thus, the Individual Defendants were directly involved in the making of the Proxy Statement.

67.     In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction and/or Stock Issuance. The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions which had input from the Individual Defendants.

68.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

69.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' conduct, the Company's

shareholders will be irreparably harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.      Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Stock Issuance, unless and until Defendants disclose and disseminate the material information identified above to Company shareholders;

B.      In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.      Declaring that Defendants violated Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder;

D.      Awarding Plaintiff reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.      Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: October 19, 2021                             Respectfully submitted,

                                          **HALPER SADEH LLP**

                                          By: /s/ Daniel Sadeh
                                          Daniel Sadeh, Esq.
                                          Zachary Halper, Esq. (to be admitted *pro hac vice*)
                                          667 Madison Avenue, 5th Floor
                                          New York, NY 10065
                                          Telephone: (212) 763-0060
                                          Facsimile: (646) 776-2600

Email: sadeh@halpersadeh.com
       zhalper@halpersadeh.com

*Counsel for Plaintiff*